IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | |
| | : | CHAPTER 7 |
| JOHN C. ROSE, | : | |
| | : | CASE NO. 1-08-bk-00317 RNO |
| Debtor | : | |

*****************************************************************************

| | | |
|---|---|---|
| ROBERTA A. DeANGELIS, ACTING | : | |
| UNITED STATES TRUSTEE, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| JOHN C. ROSE, | : | |
| | : | |
| Defendant | : | ADVERSARY NO. 1-08-ap-00092 RNO |

# Opinion[1]

The Plaintiff, United States Trustee ("UST"), filed a Complaint Objecting to Debtor's Discharge. The UST alleges that the Debtor, John C. Rose ("Rose"), violated 11 U.S.C. § 727(a)(2)(A)[2] through a series of loan agreements prior to his filing for Chapter 7 relief. The Debtor timely answered the Complaint and the parties engaged in considerable pre-trial discovery. Cross motions for summary judgment were filed and both motions were denied in an Opinion and Order dated December 22, 2008. *In re Rose*, 397 B.R. 740 (Bankr. M.D.Pa. 2008). A five-day trial was held on this matter beginning on June 18, 2009. For the reasons stated herein, I find that Rose's actions did violate § 727(a)(2)(A); therefore, Rose is not eligible for a

---

[1] Drafted with the assistance of William C. Blasses, Esquire, Law Clerk

[2] Unless otherwise noted, all future statutory references are to the Bankruptcy Code, 11 U.S.C. § 101, et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 ("BAPCPA").

1

Chapter 7 discharge.

**I.    Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157(B)(1)&(2)(a)(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

**II.   Facts**

On January 31, 2008, Rose, filed for relief under Chapter 7 of the Bankruptcy Code. On June 10, 2008, the UST filed a Complaint seeking that Rose be denied a discharge in this Chapter 7 case. Trial commenced on June 18, 2009 and continued on June 19, June 23, July 23, and July 24, 2009. The UST's Complaint largely stems from a substantial number of high interest rate loans which Rose obtained from twenty-five individuals.

Prior to trial, the parties agreed to a number of Stipulated Facts, which are found at Adversary Docket No. 70. Rose is referred to as "Defendant" in the Stipulated Facts. Particularly significant to this Opinion are the following Stipulated Facts with the numbered paragraph references taken from the Stipulated Facts:

>   4.   In 2005, Defendant's wages totaled $6,050. His "adjusted gross income" reflected on line 37 of his federal income tax return was $32,268, a figure that included a taxable retirement fund distribution of $35,000 and a loss on rental real estate of $8,833.
>
>   5.   In 2006, Defendant's wages totaled $33,250. His "adjusted gross income" reflected on line 37 of his federal income tax return was $60,681, a figure that includes debt forgiveness of $32,097 from a foreclosure on a rental property and a loss on rental real estate of $4,693.
>
>   6.   In 2007, Defendant's wages totaled $37,415. His "adjusted gross income" reflected on line 37 of his federal income tax return was $82,962, a figure that included a taxable retirement fund distribution of $7,500, a loss on rental real

estate of $4,952 and debt forgiveness of $42,984.

7. In no year prior to 2008 did Defendant have wage income of more than $50,000.

8. Defendant began to borrow money from friends and acquaintances as early as 2001 because of business setbacks.

12. Defendant was unable to repay the accumulating debt except through additional borrowing.

13. The accumulation of debt that began in 2001 began to spiral out of control in 2005.

15. Defendant borrowed money not knowing how much he owed to existing creditors.

16. Defendant induced his friends and acquaintances to lend him money based on annualized rates of interest as high as 300%.

17. Debtor induced loans from the following individuals based on misrepresentations regarding the use of the borrowed money:

    - Kelly Marburger
    - Randy Plummer
    - Terry Conley
    - Steve Myers
    - Jason Hershey
    - Lisa Zeigler
    - Andrew Smith.

40. Defendant borrowed multiple times from several of the individuals identified on Defendant's Schedule F and Exhibit 16.

41. Beginning on or before January 1, 2006, Debtor became insolvent and, as he continued to borrow money, his insolvency worsened.

42. Defendant's bank records reflect a pattern of borrowing from one individual to pay another.

3

43. At no point between June, 2005 and the date he filed for bankruptcy relief, did Defendant have an ability to repay his creditors from current employment or investment earnings.

44. When soliciting funds, Defendant did not disclose to lenders how much he owed to prior lenders.

Rose graduated from college with a Bachelor's Degree in Economics in 1994. Since graduation, he has worked in the mortgage industry. He began working for Sunset Mortgage in 1999. Trial Tr. vol. 3, 164, June 23, 2009. He was promoted to Branch Manager for Sunset Mortgage in 2003. Trial Tr. vol. 4, 70, July 23, 2009. Sunset Mortgage closed in 2007 due to the downturn of the subprime mortgage market. Trial Tr. vol. 3, 164-165, June 23, 2009. From 2007 through the present, Rose has worked for Eagle National Mortgage Company. Trial Tr. vol. 3, 165, June 23, 2009. Rose testified that he went for three months basically without income after Sunset Mortgage closed. Trial Tr. vol. 4, 74, July 23, 2009. During those three months, Rose went to work for Eagle National Mortgage Company and began filling the pipeline with new business. Trial Tr. vol. 4, 84, July 23, 2009. While the Eagle National Mortgage Company branch was operated by several former employees from Sunset Mortgage, the staff and activities are more limited than they were as Sunset Mortgage. Trial Tr. vol. 4, 78, 82, July 23, 2009.

Prior to the closing of Sunset Mortgage, Rose attempted to expand his branch's business by financing the purchase of manufactured housing. Trial Tr. vol. 3, 163, June 23, 2009. Rose testified that he had hoped for gross revenues of about $180,000.00 from this line of business over a six-month period. Trial Tr. vol. 3, 163, June 23, 2009. However, the manufactured housing program actually realized an estimated loss of $60,000.00. Trial Tr. vol. 3, 164, June 23, 2009. In addition to his job as a branch manager, Rose began to enter into real estate

4

development projects with Danny Van Dyke. Trial Tr. vol. 1, 192, 201, June 18, 2009. Mr. Van Dyke sold his dairy farm in 2004 and then was involved in several land development projects. Rose held a one-third interests in two real estate projects known as Marsh Run and Doe Run. The other two-thirds being held by Mr. Van Dyke and a third individual, Craig Stanley. Trial Tr. vol. 1, 203, June 18, 2009. Rose testified that he hoped to earn $50,000.00 from the marsh Run project and $100,000.00 from Doe Run. Trial Tr. vol. 3, 168-170, June 23, 2009. At trial, no evidence was presented showing any actual earnings by Rose from either project. Rose also testified as to his investments in three rental properties. Trial Tr. vol. 3, 14, June 23, 2009. The rental properties never generated any significant income. Trial Tr. vol. 3, 14-18, June 23, 2009. Two of the rental properties were foreclosed upon pre-petition. Trial Tr. vol. 3, 14-18, June 23, 2009. The mortgage on the remaining property was in default at the time that Rose filed his Chapter 7 petition. Trial Tr. vol. 3, 14-18, June 23, 2009.

The filed bankruptcy schedules and trial testimony reflect twenty-five individuals who made unsecured pre-petition loans to Rose. Stipulated Facts, p. 3. These claims amount to approximately $764,700.00. Because of mortgage business setbacks, Rose began to borrow through a series of individual loans in 2001. These loans began to spiral out of control in 2005 and Rose had to borrow more money through new loans to make payments on the accumulating debt. Trial Tr. vol. 3, 38, June 23, 2009. Rose testified that he also took $35,000.00 from his wife's IRA and secured a second mortgage on his residence to keep his mortgage office afloat. Further, Rose took personal loans from individuals, in part, to pay earlier individual lenders/creditors. Rose testified that finally "everything fell apart in September [2007]." Trial Tr. vol. 3, 95, June 23, 2009.

5

Rose's individual loans were almost all loans from acquaintances and friends. Some of the lenders made multiple loans to Rose. To induce the making of the loans, he made various representations regarding the intended use of the loan proceeds. Many of these representations were false. Rose testified that "I lied horribly to people." Trial Tr. vol. 5, 80, July 24, 2009. He testified that he was driven to do so because he did not want to admit failure to his wife, father, or friends. Trial Tr. vol. 3, 49, June 23, 2009. At trial, testimony showed that only some of Rose's creditors were aware that Rose had financial troubles at the time they entered into their respective loan agreements. In most of the loan transactions, Rose drafted promissory notes to be signed by him and given to the creditor. The loans often had exorbitant interest rates and were typically on a short-term basis; often with principal and interest repayment promised in several months or less. Rose testified that he paid those high rates of return because he was unable to borrow from conventional sources.

Many of these loans were induced with lies and misrepresentations. For example, on two promissory notes given by Rose, Rose forged the name of Steven Schaffer. Mr. Schaffer testified that he had no knowledge of or participation in the creditor's loan to Rose. The loan documents purported to give a security interest in real property owned by Steven Schaffer in order to secure a loan made by Kelly Marburger to Rose. Trial Tr. vol. 2, 75-78, June 19, 2009. With regard to another loan, Rose misrepresented that the loan was for the purchase of a car for resale and that the lender would be paid from the proceeds. Rose subsequently made excuses about why repayment kept being delayed. Another individual lent Rose money based on representations that it would be used to buy and resell some Hemi engines. Instead of using the money for that purpose, Rose used it to repay other creditors. Rose also made

6

misrepresentations to several creditors that loan monies would be used to purchase investment property when in reality, the funds were being used to repay prior loans.

The vast majority of Rose's repayments to his individual lenders were made with monies obtained by later individual borrowings. Rose testified "I was always looking to borrow money to pay previous creditors." Trial Tr. vol. 3, 69, June 23, 2009. Rose testified that the multiple borrowings and repayments were "the financial equivalent of juggling hundreds of balls at the same time". Trial Tr. vol. 3, 73, June 23, 2009. He lied to creditors to buy time before he would have to repay them. While there was no specific order of repayment among the creditors, Rose repeatedly made loan payments to individual creditors who threatened legal or extra-legal collection action against him. He testified that many of the loan repayments were made in cash. However, he kept no ledger or other records of cash transactions with his individual loan creditors. He paid those who yelled the loudest while delaying payments to those who were more lenient with him. Rose frequently gave post-dated payment checks to creditors who had made loans to him. Rose also gave checks to creditors knowing that there were insufficient funds in the drawer bank to cover such checks. He also continued to borrow, not knowing how much he owed to existing creditors.

Rose conceded that continuing to borrow had been a mistake, especially after the failure of the Doe Run and Marsh Run projects. Trial Tr. vol. 5, 124, July 24, 2009. However, he continued to borrow until shortly before he filed his Chapter 7 petition. The UST argues that the pattern of juggling partial payment of older loans from new loan proceeds, which continued until shortly before the petition's filing, justifies denying Rose the benefit of a discharge under § 727.

**III.    Discussion**

The UST filed this Complaint pursuant to § 727(a)(2)(A) and is seeking the denial of Rose's Chapter 7 discharge. Generally, an individual debtor in a Chapter 7 case may receive a discharge from his personal liability for all debts that had existed at the time of filing. *Kontrick v. Ryan*, 540 U.S. 443, 447, 124 S.Ct. 906, 910-911 (2004). Section 727(a)(2) allows for a denial of that discharge when:

> the debtor, **with intent to hinder, delay, or defraud** a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or . . .

(emphasis added)

The party seeking the denial of a debtor's discharge must demonstrate that denial is appropriate by a preponderance of the evidence. *In re Zimmerman*, 320 B.R. 800, 806 (Bankr. M.D.Pa. 2005) (citing *Grogan v. Garner*, 498 U.S. 279, 289-90, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991)). The party seeking denial of discharge must show that the debtor "(1) transferred or concealed property; (2) belonging to him; (3) within one year of the bankruptcy filing or after the petition was filed; and (4) with intent to hinder, delay, or defraud a creditor." *In re DiLoreto*, 266 Fed.Appx. 140, 144 (3d Cir. 2008) (citing *In re Dawley*, 312 B.R. 765, 782 (Bankr. E.D.Pa. 2004)).

The Third Circuit has noted that the purpose of the Bankruptcy Code is to provide debtors with a fresh start by relieving them from oppressive indebtedness. *In re Cohn*, 54 F.3d 1108, 1113 (3d Cir. 1995). However, the benefit of a "fresh start" is limited to the "honest but unfortunate debtor." *In re Cohen,* 106 F.3d 52, 59 (3d Cir. 1997) (citing *Grogan v. Garner,* 498

8

U.S. 279, 286-87, 111 S.Ct. 654, 659-660 (1991)). Nonetheless, the Third Circuit has also counseled that "[t]he section is to be construed liberally in favor of the debtor. . . . Completely denying a debtor his discharge, as opposed to avoiding a transfer or declining to discharge an individual debt pursuant to § 523 is an extreme step and should not be taken lightly." *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993) (internal citations omitted).

> **A.** **Transfer of property belonging to the debtor within one year of the bankruptcy filing**.

In the present case, the relevant time frame for the purposes of § 727(a)(2)(A) begins on January 31, 2007, and ends on the petition date January 31, 2008. The UST has maintained that prior to and during the aforementioned time period, Rose entered into a series of transactions that, taken together, comprise a Ponzi scheme. As detailed above, Rose pedaled a financial treadmill - using new borrowings to sporadically pay existing loans.

The definition of "transfer" under the Code is very broad. *In re Bajgar*, 104 F.3d 495, 498-499 (1st Cir. 1997); *In re Watman*, 301 F.3d 3, 10-11 (1st Cir. 2002); *see also, In re Davis*, 911 F.2d 560 (11th Cir. 1990) (finding that assets that fraudulently conveyed but recovered prior to the filing of the bankruptcy petition qualified as a transfer under the Bankruptcy Code). Section 101(54) defines a transfer as:

> (A) the creation of a lien;
>
> (B) the retention of title as a security interest;
>
> (C) the foreclosure of a debtor's equity of redemption; or
>
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with–
>
> (i) property; or

9

    (ii) an interest in property.

Property that can be transferred for the purposes of § 727(a)(2)(A) includes money belonging to the debtor. *In re DiLoreto*, 266 Fed.Appx. 140, 143 & 144 n. 2; *In re Spitko*, 357 B.R. 272, 302 (Bankr. E.D.Pa. 2006).

  I find that the repayment of older creditors with money obtained from new loans during this time period qualifies as the transfer of property belonging to Rose within one year of his Chapter 7 filing. The new loan proceeds became Rose's property when a loan was funded. He then transferred his money/property to repay some or all of an older loan. I will now discuss whether Rose transferred this property with the intent necessary to justify a denial of discharge pursuant to § 727(a)(2)(A).

  **B.  Intent**

  The UST asserts that Rose operated and maintained a Ponzi scheme. The UST argues that, therefore, a presumption of an intent to hinder, delay, or defraud creditors should exist as a result of the alleged Ponzi scheme. Second, the UST argues that such intent can be inferred from the surrounding circumstantial evidence. The party seeking a denial of discharge under § 727(a)(2)(A) has the burden of showing actual fraudulent intent, rather than mere constructive fraud. *In re Miller*, 39 F.3d 301, 306 (11th Cir. 1994) (citing *In re Wines*, 997 F.2d 852, 856 (11th Cir. 1993)). However, fraudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct. *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986).

    **1.  The applicability of the "Ponzi Scheme Presumption"**

  In fraudulent transfer cases, many courts have applied a "Ponzi Scheme Presumption" to

support a finding of actual fraudulent intent necessary to avoid a transaction pursuant to § 548, commonly referred to as fraudulent transfer. *See, e.g., In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 11 (S.D.N.Y. 2007); *In re Agricultural Research and Technology Group Inc.*, 916 F.2d 528, 536 (9th Cir. 1990); *In re C.F. Foods, L.P.*, 280 B.R.103, 110 (Bankr. E.D.Pa. 2002); *In re Global Trading Investments LLC*, 2006 WL 3040918, (Bankr. D.N.J. 2006); *In re Canyon Systems Corp*, 343 B.R. 615, 630, 636 (Bankr. S.D.Ohio 2006).

In the present case, the UST seeks that the same presumption be applied in the context of finding the intent necessary to deny a Chapter 7 discharge pursuant to § 727(a)(2)(A). *See e.g. In re Bonham*, 224 B.R. 114 (Bankr. D.Alaska 1998). In *Bonham*, the Court found that fraudulent transfers pursuant to § 548(a)(1) can also support a denial of discharge for defrauding creditors under § 727(a)(2)(A). *Bonham*, 224 B.R. at 116. Such a presumption would seem to be against the "fresh start" policy of the Bankruptcy Code. However, the Third Circuit has found, at least in the context of § 523(a)(2)(A) cases, that, "[w]here a debtor has committed fraud under the code, he is not entitled to the benefit of a policy of liberal construction against creditors." *In re Cohen*, 106 F.3d 52, 59 (3d Cir. 1997) (citing *Grogan v. Garner,* 498 U.S. 279, 286-87, 111 S.Ct. 654, 659-660 (1991)). It is, therefore, important to determine whether Rose did, in fact, operate a Ponzi scheme during the year prior to his bankruptcy filing.

One of the struggles in this case has been to find a clear definition of the term "Ponzi scheme". As noted in paragraph 13 of Rose's proposed conclusions of law, the Bankruptcy Code does not define the term. Debtor's Proposed Findings of Fact and Conclusions of Law p.14. A review of the texts and cases offer varied definitions of a Ponzi scheme. For instance, Black's Law Dictionary defines Ponzi scheme as:

11

> A fraudulent investment scheme in which money contributed by later investors generates artificially high dividends or returns for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usu.[ually] without any operation or revenue-producing activity other than the continual raising of new funds. This scheme takes its name from Charles Ponzi, who in the late 1920s was convicted for fraudulent schemes he conducted in Boston.

Black's Law Dictionary 1278 (9th ed.. 2009)

In *C.F. Foods, L.P.* the Court defined a Ponzi scheme as:

> . . . a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors. Typically, investors are promised high rates of return and initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse.

*In re C.F. Foods, L.P.*, 280 B.R. 103, 110 n. 15 (Bankr. E.D.Pa. 2002) (citing *In re Taubman*, 160 B.R. 964, 978 (Bankr. S.D.Ohio 1993).

In *Agricultural Research and Technology Group, Inc*, the Ninth Circuit defined a Ponzi

Scheme as the following:

> A Ponzi scheme is an arrangement whereby an enterprise makes payments to investors from the proceeds of a later investment rather than from profits of the underlying business venture, as the investors expected. The fraud consists of transferring proceeds received from the new investors to the previous investors, thereby giving other investors the impression that a legitimate profit making business opportunity exists, where in fact no such opportunity exists

*In re Agricultural Research and Technology Group Inc.*, 916 F.2d 528, 531 (9th Cir. 1990).

12

In *Canyon Systems Corp.*, the Court set out the following factors for determining the existence of a Ponzi scheme:

> (1) deposits were made by investors; (2) the Debtor conducted little or no legitimate business operations as represented to investors, (3) the purported business operations of the Debtor produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.

*In re Canyon Systems Corp.,* 343 B.R. 615, 630 (Bankr. S.D.Ohio 2006) (citing *In re Lake States Commodities, Inc.*, 272 B.R. 233, 242 (Bankr. N.D.Ill. 2002).

The differences among the various definitions complicate the determination of whether a Ponzi scheme was operated by Rose.

While Rose concedes that payments to lenders were made from new loans, he argues that this alone should not be sufficient to prove the existence of a Ponzi scheme. Debtor's Proposed Findings of Fact and Conclusions of Law p.17. Specifically, he analogizes it to the situation in which a debtor uses credit cards and cash advances to pay other credit cards. Debtor's Proposed Findings of Fact and Conclusions of Law p.17. While I believe this analogy is strained, I am concerned that the UST has failed to provide any bright line between a debtor who transfers balances among credit cards or incurs cash advances - which would clearly not be a Ponzi scheme - and the circumstances in the present case.

Rose also argues that the transactions that he entered into were not a Ponzi scheme because Rose had been engaged in several business enterprises, including the branch offices for Sunset Mortgage and Eagle National Mortgage Company, the operation of rental units in Reading, Pennsylvania, and several real estate projects. Debtor's Proposed Findings of Fact and Conclusions of Law p.15. Rose further argues that the success of any of these ventures would have allowed him to stop incurring any new loans and to pay down some of his existing debt.

13

Debtor's Proposed Findings of Fact and Conclusions of Law p. 15.

While the UST has presented evidence and argument that these endeavors were speculative and that "[a]t best, [the] Defendant 'profoundly fooled' himself" regarding his ability to make money from his ventures, such a finding could arguably be inconsistent with a finding that Rose had established and run a Ponzi scheme. Post-Trial Br. of UST p. 29. The evidence presented demonstrated that Rose did expend money and did expect returns from investments in several real estate projects as well as his mortgage business. To find that a Ponzi scheme existed because Rose's expectations were unjustified suggests that a Ponzi scheme could be established after the fact - only if his brokerage business and projects failed. Also, there was scant evidence presented that new lenders made loans in reliance upon Rose's real estate investments.

Further, in this case, nearly all the individual lenders knew Rose, either through his mortgage broker business or as a personal acquaintance. He contacted them to obtain loans. I find this differs from the traditional Ponzi schemes where news of the returns paid to initial investors brings in new investors. News of returns can be spread through the media or by word of mouth. There was no evidence presented here that an individual lender approached Rose to initiate a loan.

Another point of contention involves whether the nature of the transactions themselves were in the nature of a Ponzi scheme. With exception of the two notes purporting to give security interests in real property, Rose's loans consisted of unsecured promissory notes between the parties rather than any equity stake in any investment property, mutual fund, stock share, etc. Nonetheless, the UST has correctly pointed out that unsecured notes themselves could be sufficient to find a Ponzi scheme. Post-Trial Br. of UST p.23. Rose, on the other hand, asserts

14

that the classic Ponzi scheme involves the investing of money based on representations of a business venture. Debtor's Proposed Findings of Fact and Conclusions of Law p. 15. The classic case of Charles Ponzi provides some basis for that assertion. There, the participants loaned monies to Ponzi partially on the belief that the money loaned would be used in a business venture involving the resale of property. Ponzi spread rumors that he was buying international postal coupons in one country and selling them in another at a one hundred percent profit. *Cunningham v. Brown*, 265 U.S. 1, 7-8, 44 S.Ct. 424, 425 (1924).

In the present case, several creditors testified that their loans were based on the belief that the money would be used to invest in different types of property for resale. However, other creditors testified that, at the time of lending, they were generally aware of Rose's poor financial circumstances and that the money might be used to pay some of Rose's other debts. The high rates of interest offered by Rose can cut two ways. First, several creditors testified they made subsequent, larger loans to Rose because their first loan was repaid with high interest. In these instances, the high interest rate may have served as a loan inducement. On the other hand, a high interest rate could serve as a warning of the riskiness of the loan.

I find that a broad application of the Ponzi presumption is unnecessary and inappropriate in the case at bar. As noted above, the Third Circuit has previously determined that a liberal construction in favor of the debtor's fresh start is inappropriate in applying § 523(a) exceptions to discharge where a debtor has perpetrated a fraud upon the complaining creditor. *See In re Cohen*, 106 F.3d at 59. This is a specific, narrow exception to the liberal construction rule that is otherwise broadly applied to exceptions to discharge. *See Rosen*, 996 F.2d at 1531. In choosing whether to apply the Ponzi presumption, a court is tasked with determining whether to shift the

burdens and presume that the debtor has, in fact, committed fraud sufficient to generally deny a discharge. Such a presumption places a heavy burden on a debtor to bring forward direct or, more likely, circumstantial evidence that fraud has not been perpetrated.

In *Rosen*, the Third Circuit made it clear that finding a debtor ineligible for a discharge pursuant to § 727(a) was much different than merely "declining to discharge an individual debt pursuant § 523" and was "an extreme step". *Rosen*, 996 F.2d at 1531. Consistent with this concern, I find that applying the Ponzi scheme presumption in a broad fashion in this case would be inappropriate.

In the present case, it appears that the only attributes of a Ponzi scheme are that Rose borrowed money from other parties at high rates of interest and then used the money to repay other loans. As mentioned above, except for the numerosity and scale of the transactions, this seems little different than repeated cash advances. Absent more concrete evidence of a formal scheme, the risk of presuming fraud, with the attendant denial of discharge, outweighs any utility that the application of the Ponzi presumption would serve. Therefore, I find that the Ponzi scheme presumption does not apply in this case.

### 2. The circumstantial evidence

The intent necessary for a denial of discharge may be found from "inferences drawn from a course of conduct." *Zimmerman*, 320 B.R. at 806. Such inferences can be made by considering "badges of fraud." *In re DiLoreto*, 266 Fed.Appx. at 144 (referencing *In re Watman*, 301 F.3d 3, 8 (1st Cir. 2002)).

> Those indicia [of fraudulent intent] include: (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial

> condition of the party sought to be charged both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by debtor to keep the transfer a secret; . . ."

*In re Watman*, 301 F.3d 3, 8 (1st Cir. 2002) (citations omitted).

In looking at the *Watman* indicia of fraudulent intent, the first three indicia would seem to have very little application in this case. The only creditor that could be considered to have been an insider is Rose's father. However, most of the repayments here went to creditors who were merely friends or acquaintances. Little evidence was presented that Rose retained possession or benefit of any of the funds that he transferred to older creditors in repayment of prior loans. There was, however, evidence to suggest that some loan monies were used to pay Rose's business and personal expenses. Finally, the evidence shows that the bulk of the transfers were made to repay old loans. The UST did not argue that these transfers were made with inadequate consideration. Therefore, I find that, at most, one of those badges is applicable to this case.

However, a clear intent to defraud was shown with respect to the remaining badges. With respect to the fourth indicator, through testimony and the pre-trial stipulated facts, Rose admitted that he was insolvent all the way back to January 1, 2006. His condition after each transaction worsened, especially after he became insolvent. The positions of the remaining creditors eroded as he borrowed more and more money to pay off the earlier loans.

As to the fifth indicator, Rose knew that the loans had begun to spiral out of control in 2005. He had begun these loans in 2001. Even after he became insolvent, he kept incurring more and more obligations. The trial record established that there was no reasonable likelihood

17

of repayment. While it is believable that Rose engaged in these transactions out of desperation, that alone does not justify the extent to which Rose continued with loan transactions even after the Marsh Run and Doe Run development projects suffered setbacks and it became clear that they would not result in any income to him. It is true that many debtors incur new debt in a "last ditch effort" to work their way out and to avoid bankruptcy. Here, Rose even lost track of how much he owed his creditors. It is clear to me that after 2005, Rose was trying to "buy time" and delay the eventual fall of the many "loan balls" he was juggling.

The sixth indicator involves many of the same circumstances as the previous two indicators of fraud. The general chronology of events shows that Rose engaged in more and more loans. After his unsuccessful ventures failed to pay off earlier loans, he took more loans to "buy time" and hide his misfortune from his family and his creditors. Instead of stopping when the loans were many multiples of his yearly income, he kept incurring more loans. To induce people to enter into these loans, he made many misrepresentations and promised interest rates many times higher than the prime rate. After losing track of the amount of loans, he continued incurring them for almost three more years until he filed bankruptcy. Rose, an experienced mortgage broker, obtained many of his loans from several individuals who had little financial experience and no prior lending experience.

The last indicator involves attempts by a debtor to keep transfers secret. The stipulated facts and testimony show that most of the money Rose received from lenders was put into accounts that were opened so that Rose could receive new loan monies and pay back previous lenders without his wife's knowledge. Additionally, Rose admitted that he operated in secrecy, did not disclose his true financial picture, gave lenders excuses, and had no repayment priority

18

method. Rather he paid the "squeaky wheel" - and took new loans to further his artifice.

**V.     Conclusion**

For the reasons set forth above, I find that Rose transferred property belonging to him within one year of filing his Chapter 7 petition with the intent to delay, hinder, and defraud creditors. Considering all of his relevant conduct, I find that Rose is not eligible for a Chapter 7 bankruptcy discharge. An Order will be entered consistent with the foregoing Opinion.

By the Court,

Date: March 12, 2010

Robert N. Opel, II, Bankruptcy Judge
(BI)

*This opinion is electronically signed and filed on the same date.*